(221 P.3d 1147)
No. 101,011

CHERON JOHNSON, *Appellant*, v. STATE OF KANSAS, *Appellee*.

Opinion filed December 11, 2009.

*Jean K. Gilles Phillips*, of Paul E. Wilson Defender Project, University of Kansas School of Law, for appellant.

*Boyd K. Isherwood*, assistant district attorney, *Nola Tedesco Foulston*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREEN, P.J., MARQUARDT and BUSER, JJ.

GREEN, J.: Cheron Johnson appeals from the trial court's denial of his K.S.A. 60-1507 motion after holding an evidentiary hearing. Johnson maintains that the defense attorney who had represented him in his underlying criminal case rendered ineffective assistance of counsel and that his nolo contendere plea to first-degree premeditated murder and aggravated robbery should be set aside. We

disagree. Although it is undisputed that defense counsel was using cocaine during the time period that he was representing Johnson, the critical inquiry is whether counsel's performance was deficient and whether that deficiency prejudiced Johnson. Because Johnson has failed to show that the representation he received from defense counsel was deficient, Johnson's ineffective assistance of counsel claim fails. Accordingly, we affirm.

Johnson's underlying convictions were based on the brutal killing of Taurus Hampton in November 2000. The facts of the killing were provided by the State during Johnson's plea hearing. Johnson's friend, Anthony Payne, lived across the street from Hampton, and both Johnson and Payne had previously played video games at Hampton's house. Hampton lived by himself and sold crack cocaine out of his house.

On November 4, 2000, Johnson and Payne decided to rob Hampton. Johnson and Payne got steak knives from Payne's house and then went to Hampton's house to play video games. While there, Johnson and Payne attacked Hampton and stabbed him over 30 times in his chest and throat. Hampton died from the stab wounds.

When Hampton's body was discovered, his hands had many defense wounds. Moreover, Hampton's skull had been fractured by what appeared to be a blow by a rifle. In addition, Hampton's liver was ruptured, which appeared to result from a stomping.

Several items were taken from Hampton's house, including money, PlayStation CD's, and approximately $4,000 in crack cocaine. Police officers later stopped a car belonging to Michael Joslin, who was reported to have participated in planning the robbery. A down winter jacket, which a witness identified as Johnson's jacket, was found in the back of the car and searched. The jacket contained a large amount of crack cocaine and 18 PlayStation CD's. Hampton's ex-girlfriend identified the CD's as belonging to Hampton. Johnson's fingerprint was found on one of the CD's. Through forensic testing, it was revealed that a blood spot on one of the CD's was consistent with Hampton's DNA.

The police later searched Johnson's apartment where they found a bloody boot. The impression on the bottom of the boot matched

a bloody footwear impression in Hampton's bathroom. DNA testing revealed that the DNA on the boot was consistent with Hampton's DNA.

In February 2001, Johnson pled nolo contendere to one count of first-degree premeditated murder in violation of K.S.A. 21-3401(a) and one count of aggravated robbery in violation of K.S.A. 21-3427. Although Johnson was 17 when the crimes were committed, he had been certified to be tried as an adult.

Johnson's plea hearing was held on the same day that Johnson was scheduled for trial. Nevertheless, Barry Disney, the prosecutor in the case, testified that because Johnson's case had not yet been assigned out to a trial judge, Disney did not anticipate going to trial at that time. Disney testified that if the case was going to trial, it would have either been later in the week or the following week.

In exchange for Johnson's nolo contendere plea, the State agreed to ask for dismissal of the alternative charge of felony murder, recommend that Johnson's sentence for aggravated robbery run concurrent with his sentence for first-degree murder, and not ask to increase Johnson's parole eligibility date beyond 25 years. Payne entered into an identical plea agreement with the State, except that Payne pled *guilty* to the first-degree premeditated murder and aggravated robbery charges.

Before accepting Johnson's plea, the trial court discussed with Johnson the terms of the plea agreement, the rights he was giving up by entering his plea, and the sentences that he was facing. In addition, the trial court ascertained from Johnson that he had not been threatened with or promised anything in entering the plea and that he was satisfied with his attorney's services. At the conclusion of the plea hearing, the trial court found that Johnson had knowingly, intelligently, and voluntarily waived his constitutional rights and entered his nolo contendere plea.

Later, at sentencing, the trial court gave Johnson the opportunity to make a statement on his own behalf in mitigation of punishment. Johnson stated:

"I would like to apologize to my family, Anthony's family, Michael Gile[s]' family, and I would like to say that Michael Giles didn't have anything to do with this.

I'm sorry that his family had to go through all this pain as well as Taurus's family. That's it."

The trial court sentenced Johnson to a hard 25 years in prison on his first-degree murder conviction and a concurrent sentence of 71 months in prison on his aggravated robbery conviction.

In October 2001, Dan Phillips, the attorney who represented Johnson in his criminal case, was indefinitely suspended from the practice of law. Phillips had been on supervised probation when he represented Johnson. Phillips was suspended after he tested positive for cocaine three times during his probation. See *In re Phillips*, 280 Kan. 262, 121 P.3d 422 (2005).

In February 2002, which was more than 11 months after his sentencing hearing, Johnson moved to allow the late filing of a notice of appeal. Nevertheless, the trial court denied Johnson's motion.

In April 2002, Johnson moved to withdraw his nolo contendere plea. Johnson alleged that his right to effective assistance of counsel had been violated by his trial attorney. Johnson focused on the fact that his attorney had been on supervised probation and had tested positive for cocaine during the time that he was representing Johnson. Johnson maintained that his attorney had failed to investigate Johnson's claim of innocence and had used coercion and threats to induce him to plead to the crimes. The trial court summarily denied Johnson's motion to withdraw his nolo contendere plea.

Johnson never appealed the trial court's denial of his motion to withdraw his nolo contendere plea. Johnson later testified that he had not received timely notice of the trial court's decision or any information about appealing the decision.

On July 15, 2004, Johnson moved for relief under K.S.A. 60-1507. Johnson raised essentially the same arguments that he did in his motion to withdraw his nolo contendere plea. The trial court appointed counsel to represent Johnson and held an evidentiary hearing on Johnson's K.S.A. 60-1507 motion.

At the evidentiary hearing, Phillips testified extensively about his addiction to crack cocaine. According to Phillips, his crack cocaine usage began in 1992 and became a full-fledged addiction in 1994.

In October 1996, he was placed on a 3-year supervised probation by order of our Supreme Court after three individuals filed complaints against him. Nevertheless, the attorney supervising Phillips walked away from his law practice and left Kansas, and Phillips' case fell through the cracks.

It was not until 1999 or 2000 that attorney Jon Hansen began supervising Phillips. As part of his probation, Phillips was supposed to submit to drug testing three times a week beginning in July 2000. Phillips tested positive for cocaine on September 12, 2000; March 1, 2001; and July 5, 2001. In addition, Phillips' creatine levels were low in February 2001. Low creatine levels indicate that an individual is "flushing" or drinking a lot of water to wash the metabolites out of the individual's system. Further, Phillips missed a number of scheduled drug tests and had a pattern of missing tests on Monday. On February 12, 2001, the day that Johnson entered his nolo contendere plea, Phillips missed his scheduled drug testing.

Phillips admitted that during the period of September 2000 to October 2001, he was using crack cocaine anywhere from once a week to two or three times a month. Phillips admitted that he had missed some of his scheduled drug tests in order to avoid testing positive for cocaine. Moreover, Phillips testified that he had tried to "flush" his system to avoid testing positive.

Phillips testified that although his addiction took a strong toll on him physically, it did not affect his ability to rationalize. According to Barry Disney, the prosecutor in Johnson's case, Disney never noticed anything out of place with regard to Phillips' appearance, his decision-making ability, or his ability to track their conversations. Similarly, Hansen testified that he did not observe Phillips' drug usage impacting his law practice. According to Hansen, Phillips was in court when he was supposed to be there, was handling cases in a competent manner, was returning phone calls, and was not mishandling money. Hansen testified that Phillips seemed competent and that he was conducting his practice in a competent manner.

During the evidentiary hearing, Johnson testified that he had maintained his innocence throughout the case and had not wanted to enter into a plea agreement. According to Johnson, Phillips'

opinion was that the State had overwhelming evidence against him and that he was going to get 25 years to life in prison or an even harsher sentence. Johnson testified that Phillips never talked to him about the witnesses he was going to call, about his defense strategy, or about Johnson's testimony. Johnson further testified that he saw Phillips only about six times while he was in jail.

According to Johnson, Phillips came to see him the Friday before his scheduled trial on Monday and brought him a plea agreement. Johnson testified that he told Phillips that he did not want to read any plea agreement but that he wanted Phillips to talk with Payne. During Payne's police interview, Payne stated at one point that Payne had dealt all of the blows to Hampton and that Johnson did not want him to kill Hampton. Nevertheless, when pressed by the police, Payne discussed how Johnson had planned the attack and described how Johnson had used his knife to cut Hampton "from the head to the center, making those injuries and turned around and got his waist and made those injuries."

Johnson testified that after the Friday visit by Phillips, Phillips met with Johnson again and told him that he had talked with Johnson's family and that they wanted him to take the plea. Johnson testified that when he stated he would not take the plea, Phillips told him that he could get 50 years to life or life without parole. According to Johnson, Phillips "was just trying to scare me, I guess, cause he said, You got a chance to getting out when you're in your 40s or you got a chance at never getting out. Which one do you want[?] It is not my life."

According to Johnson, when he went to court for his trial setting on February 12, 2001, Phillips pulled him into a room and told him that his mom was crying and that his parents expected him to take the plea. Johnson testified that he had not dressed for court and was still wearing his orange jail jumpsuit.

According to Johnson, he had not read through the written plea acknowledgment before he went into the courtroom to plead nolo contendere. Johnson testified that Phillips told him that the trial judge would ask him some questions and that Johnson should act like he understood because the judge did not have to honor the plea agreement and could still give him 50 years to life in prison.

Johnson's mother, Karen Garrett, and Johnson's stepfather, Ricky Cornwell, testified that Phillips had talked with them about convincing Johnson to take the plea agreement offered by the State. According to Garrett, Phillips told them that Johnson could face the hard 50 sentence and that if they ever wanted to see Johnson, it would be best for him to take the plea bargain. According to Cornwell, Phillips took him into a room at the courthouse and showed him pictures of the crime scene in order to encourage Johnson to take the plea bargain. Garrett testified that to her knowledge, Phillips never investigated or talked to any witnesses.

Both Garrett and Cornwell testified that Phillips never talked with them about Johnson's background. According to Garrett, Johnson had been working on his GED and was supposed to start a new job before he was arrested.

Phillips testified that he had prepared for trial by going over with Johnson the affidavits and pictures in the case, the police reports, and the potential witnesses. Although Phillips was unable to find his file in Johnson's criminal case, Phillips testified that he believed he had reviewed the transcript of Payne's statement and that he had interviewed witnesses before the preliminary hearing. In addition, Phillips had reviewed evidence in the case with Disney. Phillips testified that he had at least two meetings with Johnson's family. Phillips' billing statements reflect that he also conducted over 7 hours of witness interviews in the case. Phillips, however, could not recall the particular witnesses that he had interviewed. Phillips testified that he had talked with Payne's attorney, who felt that Payne did not have a defense in the case.

Phillips further testified that he had sat down with Johnson on more than one occasion and discussed what the prosecutor would ask him if he testified at trial. The jail records showed that Phillips had visited Johnson 13 or 14 times between December 8, 2000, and March 7, 2001. The records established that Phillips had visited Johnson the Friday before the scheduled trial, the Sunday night (10:23 p.m.) before the scheduled trial, and the morning (10:36 a.m.) of the scheduled trial.

Phillips testified that during his visits, he tried to get Johnson to tell his side of the story in the case, but Johnson would not provide

him with a workable defense. Phillips further testified that he asked Johnson what witnesses he could talk to, but Johnson did not give him any specific names. All that Johnson told him was that he did not want to be convicted and that he did not want to serve 50 years.

According to Phillips, Johnson had stated that he wanted to go to trial up until a certain point in the case. Phillips estimated that they initially entered into plea negotiations after Johnson waived preliminary hearing. Phillips further testified that he told Johnson that Johnson was the only one who could make the decision of whether to enter a plea or take the matter to trial. Phillips denied that he had ever threatened Johnson or his family members with the idea that Johnson could be sentenced to life in prison without parole.

Phillips testified that he believed he had prepared for and was in anticipation of trial. Nevertheless, Phillips testified that he thought they might reach a plea agreement before trial. According to Phillips, he had not subpoenaed witnesses for trial because the available witnesses were the State's witnesses.

Disney testified that the evidence against Johnson was strong and that in his opinion, the only issues in the case were whether Johnson would receive a hard 50 sentence and whether his sentences would run consecutive. Disney further testified that both Payne's and Johnson's cases took a parallel path with identical charges and identical plea agreements. According to Disney, he did not notice any substantial difference between the representation given by Payne's attorney and that given by Johnson's attorney. Disney testified that plea negotiations had been going on for some time before Johnson entered into the plea agreement.

At the conclusion of the K.S.A. 60-1507 evidentiary hearing, the State argued that Johnson's K.S.A. 60-1507 motion should be dismissed. The State contended that Johnson had already raised the issue regarding Phillips' representation in his motion to withdraw his plea and had failed to appeal the trial court's adverse ruling. Moreover, the State pointed out that Johnson had filed his K.S.A. 60-1507 motion past the time period provided in K.S.A. 60-1507(b).

The trial court denied the State's motion to dismiss based upon a finding of manifest injustice. The trial court found that Johnson's K.S.A. 60-1507 motion had been filed only 3 weeks late, that Johnson had filed his motion without the benefit of an attorney, that Johnson's previous motion to withdraw his plea had been filed and argued without the benefit of an attorney, and that the issue raised in his motions had a basis for an evidentiary hearing.

The trial court proceeded to thoroughly discuss the evidence presented at the evidentiary hearing and made detailed findings of fact and conclusions of law on Johnson's ineffective assistance of counsel claim. The trial court determined that under the totality of circumstances, Phillips displayed a level of competency by which he rendered effective assistance of counsel. Moreover, the trial court found that there had been no prejudice to Johnson. As a result, the trial court denied Johnson's K.S.A. 60-1507 motion.

On appeal, Johnson argues that the trial court erred in denying his ineffective assistance of counsel claim. Johnson maintains that as a result of Phillips' addiction to crack cocaine, Phillips' failure to investigate and prepare for trial, and Phillips' offering of erroneous advice, he pled guilty to first-degree murder.

A two-prong test applies to set aside a guilty plea because of ineffective assistance of counsel. The defendant must prove: (1) counsel's performance fell below the standard of reasonableness; and (2) a reasonable probability exists that, but for counsel's errors, the defendant would not have pled guilty and would have insisted on going to trial. *State v. Adams*, 284 Kan. 109, 118, 158 P.3d 977 (2007).

Generally, a claim alleging ineffective assistance of counsel presents mixed questions of fact and law requiring de novo review. *Harris v. State*, 288 Kan. 414, 416, 204 P.3d 557 (2009). In this case, however, the trial court held a full evidentiary hearing after which it issued detailed findings of fact and conclusions of law. As an appellate court, we review the trial court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. This court's review of the trial court's ultimate conclusions of

law is de novo. *Bellamy v. State*, 285 Kan. 346, 354-55, 172 P.3d 10 (2007).

Not surprisingly, in his appellate brief, Johnson focuses on Phillips' drug addiction in arguing that Phillips rendered ineffective assistance of counsel.

In addressing Johnson's argument, this court bears in mind that the great weight of authority is that a defense attorney's use of drugs or alcohol does not establish ineffective assistance of counsel per se. See *State v. Green*, 274 N.J. Super. 15, 29-31, 643 A.2d 18 (1994) (rejecting defendant's argument that defense attorney's alcoholism and drug dependency created rebuttable presumption that attorney's conduct was constitutionally defective) (citing *Burnett v. Collins*, 982 F.2d 922, 930 [5th Cir. 1993]; *Berry v. King*, 765 F.2d 451, 454 [5th Cir. 1985], *cert. denied* 476 U.S. 1164 [1986]; *Young v. Zant*, 727 F.2d 1489, 1492-93 [11th Cir. 1984], *cert. denied* 470 U.S. 1009 [1985]; *McDougall v. Rice*, 685 F. Supp. 532, 539-40 [W.D.N.C. 1988]; *Hernandez v. Wainwright*, 634 F. Supp. 241, 245 [S.D. Fla. 1986], *aff'd* 813 F.2d 409 [11th Cir. 1987]; *State v. Coates*, 241 Mont. 331, 786 P.2d 1182 [1990][, *overruled on other grounds by Porter v. State*, 313 Mont. 149, 153, 60 P.3d 951 (2002)]; *People v. Garrison*, 47 Cal. 3d 746, 254 Cal. Rptr. 257, 765 P.2d 419 [1989]).

Recognizing that the two-pronged test for ineffective assistance of counsel adopted in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh. denied* 467 U.S. 1267 (1984), was sufficiently protective of a defendant's rights, the New Jersey Supreme Court in *Green* stated:

"We discern no sound basis to adopt less rigorous standards merely because it is shown that a defendant's trial attorney was drug dependent. A *per se* rule would create a presumption against the competence of attorneys with drinking or drug problems and would invite convicted defendants to delve into the personal lives of their lawyers on the basis of mere speculation. It bears repeating that convicted prisoners are strongly motivated to attack the competency of trial counsel. The 'rubber-stamp' familiarity and 'monotonous regularity' of such claims are well-known to appellate judges. [Citation omitted.] We recognize that there are both good attorneys and bad attorneys and that even the best of counsel make mistakes. However, we are satisfied that the two-part test adopted in *Strickland* . . . is sufficiently protective of a defendant's rights. The critical inquiry is whether, for

whatever reason, counsel's performance was deficient and whether the mistakes made prejudiced the defendant's right to a fair trial." 274 N.J. Super. at 30.

Similarly, the Fifth Circuit Federal Court of Appeals has held that "under *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant." *Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985).

Applying these principles to the case at hand, we conclude that Johnson has failed to meet his burden to show that Phillips' representation was deficient. Although Johnson would like for this court to accept as true his testimony concerning Phillips' investigation of the case, Phillips' alleged statements that he could be sentenced to more than 50 years in prison, and Johnson's insistence on taking the case to trial, this court's standard of review does not allow for such a determination. Essentially, Johnson is asking this court to pass on the credibility of the witnesses and to reweigh the evidence that was presented at the K.S.A. 60-1507 evidentiary hearing. Nevertheless, as an appellate court, this court does not pass on the credibility of witnesses or reweigh conflicting evidence. See *Drach v. Bruce*, 281 Kan. 1058, 1067, 136 P.3d 390 (2006), *cert. denied* 549 U.S. 1278 (2007). As is evident from the trial court's decision, the trial court simply found the testimony of Phillips, which was in part supported by the testimonies of Disney and Hansen, to be more credible than Johnson's testimony.

In its decision denying Johnson's K.S.A. 60-1507 motion, the trial court recognized the conflicting testimony presented at the evidentiary hearing and then thoroughly and adequately explained the reasons that it disbelieved Johnson's testimony that he had been coerced into pleading nolo contendere:

"Why would Mr. Phillips get up here and, as opposed to say I don't remember something, which he did several times, why would he distinctly say things that were not the truth. Mr. Phillips has already bared his soul, for lack of a better term, to the world with his cocaine or crack addiction. And all the scorn and professional disgust that might have been levied upon him by many, many people in our community. He's lived through that. He lives that on a daily basis. If in fact Mr. Phillips was making this up, what benefit does he have to do this at this time.

As opposed to saying I don't remember. And essentially falling on a sword to benefit his client. I don't see any motivation from Mr. Phillips to lie, and I'm sure some people could come up with some potential motivations for Dan Phillips to lie, but I'm not . . . saying it.

"Mr. Phillips said that he did an investigation with the materials provided to him by the district attorney's office that in his opinion they were pretty substantial. That they included DNA. That he tried with limited success to develop a theory of defense, some response to the State's evidence and theory of prosecution with Mr. Johnson, but did not meet with much success from Mr. Johnson in attempting to do that.

"Mr. Phillips did meet with Mr. Johnson several times . . . prior to the plea. This was scheduled for a jury trial date, which ultimately turned into the plea agreement of February 12, 2001. But he met with him on February 11, 2001, Sunday. He said Sunday evening. Mr. Phillips says that was to discuss the plea. Mr. Johnson said that was absolutely not to discuss the plea. Yet Mr. Johnson shows up in court on a trial date wearing his orange jump suit. We don't have any testimony as to what normal procedure is in Sedgwick County, but that's not my knowledge of the normal procedure. A person going to jury trial doesn't show up in a jump suit. A person entering a plea doesn't dress out and does show up in a jump suit.

"The aspect that Mr. Johnson is innocent, was innocent, has always maintained his innocence and has always maintained his desire to have a jury trial and to hopefully be acquitted of those charges, belies what happened at both the plea hearing and the sentencing hearing. Judge Waller went over with Mr. Johnson Mr. Johnson's rights at the plea hearing. Mr. Johnson never once said or expressed any surprise or reluctance or consternation at entering a plea. A no contest plea. Even after Mr. Disney presented the fact basis on Judge Waller's request, Mr. Johnson did not protest the entry of the plea of no contest.

"Now, from the testimony I've received, up until Mr. Johnson met with Mr. Phillips Monday morning, February 12 of 2001, Mr. Johnson was under the impression he was going to trial. And within that five minute meeting, and I think that's . . . the time frame counsel have both used, within that five minute meeting, Mr. Phillips was able to coerce Mr. Johnson into giving up his claim of innocence and into giving up his months long held desire to have a jury trial. And had been under the coercion while taking that plea of no contest to this charge. Or these two charges.

"Quite honestly, that is wholly inconsistent with the demeanor I've seen from Mr. Johnson when he was testifying today. I think if Mr. Johnson had had this strung on him at the last minute, had been the alleged victim of a coerciveness by Mr. Phillips, at least in attempting to get him to plea by surprise, I think Mr. Johnson would have expressed a disagreement with that on the record, not only to the judge, but probably to anybody within hearing distance.

"And I based that on the verbal answers, the physical exclamation, the verbal answers given to many of the questions asked by Mr. Isherwood concerning his

plea, the proceedings, things along those lines. The demeanor I saw today would not allow Mr. Johnson to quietly proceed with a coercion plea contrary to his desire to have a jury trial. I think on the totality of the circumstances, that Mr. Johnson knowingly, intelligently, freely and voluntarily entered a plea. That he took advantage of a plea negotiation, that maybe he hoped for something better. But he also knew a jury trial could result in something worse. I think that was a rational decision on his part.

"I think his decision to pursue this 1507 is largely based on the hope that this drug addiction, this revelation of drug addiction could again, as I've already stated, be his ticket to a retrial that could possibly result in a lesser sentence, a lesser charge conviction, and accordingly, a lesser sentence or an outright conviction or possibly a reduced sentence, a reduced conviction or reduced recommendation from some subsequent plea negotiation.

"I have no testimony in front of me that any other reasonable or competent attorney would have done more investigation than that done by Mr. Phillips based on the information given him by the DA or that he would have specifically done different types of investigation based on the information given by the DA's office or that another attorney would have made a different recommendation to Mr. Johnson from a plea. To the contrary, it is not directly evidence, but there has been some mention made of the co-defendant Mr. Payne, who is represented by Ernie Tousely, that it was essentially an equivalent situation, same charges, same sentencing possibilities and essentially the same plea was made.

"I will note that, I don't remember where I saw it, but one of the documents, that there was DNA testing that placed . . . the decedent's blood on a CD case owned by the decedent and that CD case was ultimately found in Mr. Johnson pocket or jacket pocket. I will also note that there was DNA evidence that was developed that identified some blood on a boot found in Mr. Johnson's, I believe, bedroom or at least house, as being the same blood belonging to the decedent.

"I think under the totality of the circumstances, that even under the level of *Strickland*, that Mr. Phillips did display a level of competency whereby he was effective assistance of counsel. He did not fall below that standard. And I'm finding for the reasons I've already stated that there is no prejudice in this matter that has been caused to Mr. Johnson. Accordingly, I'm denying the motion for relief under K.S.A. 60-1507."

Although the trial court's findings are supported by substantial competent evidence in the record, Johnson now attempts to expand the factual base surrounding his allegations by citing to *Thomas v. Nelson*, 2007 WL 1455883 (D. Kan. 2007) (unpublished opinion). In that case, the court granted the petitioner's motion for a writ of habeas corpus after finding that Phillips' representation of the petitioner was ineffective. Johnson maintains that "[t]he eerie similarity in Mr. Phillips' conduct in <u>Thomas</u> lends credibility

to Mr. Johnson's consistent statement that he was pressured into a plea and threatened with life without parole." Nevertheless, Johnson's analogy breaks down when it is subjected to scrutiny.

For example, the facts in the instant case are vastly different from those in *Thomas*. In *Thomas*, the petitioner had asked for appointment of a different attorney numerous times throughout the criminal proceedings. In requesting appointment of a new attorney, the petitioner himself told the trial court that he refused to go to trial with Phillips because Phillips had made known that he thought that the petitioner was guilty of the charged crime. Nevertheless, the trial court refused to remove Phillips as appointed defense counsel. When the petitioner repeatedly refused to accept a plea offer, Phillips showed him a fingerprint card and told him, "With these fingerprints they are going to find you guilty and also the state is going to request that you be sentenced under the Habitual Criminal Act." In actuality, however, the petitioner was not subject to sentencing under the Habitual Criminal Act. Moreover, the fingerprints on the fingerprint card did not match the petitioner's fingerprints. Based on his unsuccessful efforts to remove Phillips as his attorney and his conversation with Phillips regarding a sentence under the Habitual Criminal Act, the petitioner waived jury trial and accepted the plea agreement.

Here, different from *Thomas*, the record fails to show that Johnson was under the mistaken belief that he could receive more than 50 years in prison for the charge of first-degree premeditated murder. Rather, both the plea agreement and the trial court's statements to Johnson at the plea hearing inform Johnson that the maximum sentence for his charge of first-degree murder was a hard 50 years in prison.

Moreover, unlike *Thomas*, the record from Johnson's criminal case fails to demonstrate that Johnson was unhappy with his attorney's representation or that he was coerced into accepting the plea agreement. Indeed, the lengthy colloquy between Johnson and the trial judge at Johnson's plea hearing establishes that Phillips' services had been satisfactory to Johnson and that Phillips had discussed the facts and law in the case with Johnson:

"[Trial court:] Other than your plea agreement, has anyone threatened you with anything or promised you with anything in order to get you to plead nolo contendere?

"[Johnson:] No.

"[Trial court:] Have the services of Mr. Phillips as your attorney been satisfactory to you?

"[Johnson:] Yes.

"[Trial court:] Has he been able to give you legal advice and discuss the facts and law with you in this case?

"[Johnson:] Yes.

"[Trial court:] Do you have any complaints about the way the Court has treated you?

"[Johnson:] No, sir."

Because the facts in this case are far different from those in *Thomas*, Johnson's analogical argument is questionable. As a result, we reject Johnson's argument that there is an "eerie similarity" between this case and *Thomas*.

In addition, as the State points out, the facts relied upon by the *Thomas* court were never introduced at the hearing before the trial court. Had Johnson believed that this information was relevant and admissible, he should have attempted to introduce those facts at the K.S.A. 60-1507 evidentiary hearing. It is questionable whether this evidence would have even been admissible as character evidence against Phillips. See K.S.A. 60-447 and 60-448 (evidence of specific instances of conduct, except evidence of convictions for crime, inadmissible to prove character); 4 Gard and Casad, Kansas Law and Practice, Kansas Code of Civil Procedure, 4th Annot. § 60-447, p. 569-70 (2003); *Gardner v. Pereboom*, 197 Kan. 188, 416 P.2d 67 (1966) (applying rule that evidence of specific instances of conduct to prove character trait, except evidence of conviction of crime, is inadmissible).

Moreover, this evidence would not have been admissible as evidence of habit under K.S.A. 60-449. Habit "refers to repeated occurrences which form a basis for" a specific type of conduct. 3 Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence, § 5.4, p. 133 (5th ed. 2009). This one instance of Phillips' behavior in *Thomas* would not show that this was Phillips' regular way of dealing with a particular kind of situation with a specific

type of conduct, such as misrepresenting a fingerprint card to a defendant in order to get the defendant to plead guilty to a charge. See *Hardesty v. Coastal Mart, Inc.*, 259 Kan. 645, 915 P.2d 41 (1996) (evidence of isolated specific instances of a person's conduct does not establish habit).

In addition, the State points out that there is a world of difference between citing to a case for a specific legal proposition and attempting to adopt facts from a foreign case to counter the facts as established in a separate proceeding. See generally *State v. Bryant*, 285 Kan. 970, 179 P.3d 1122 (2008) (impermissible to try to expand facts on appeal in manner not provided by Supreme Court rule); Supreme Court Rule 6.02(d) (2009 Kan. Ct. R. Annot. 38) (facts not keyed to appellate record should not be considered on appeal). Even if the facts from *Thomas* were admissible, the State should have been given an opportunity to cross-examine this evidence and test the similarity of the facts in *Thomas* to the facts of this case. It is now disingenuous for Johnson to suggest that the trial court erred in its ruling by presenting facts outside of the appellate record.

Finally, Johnson asserts that Phillips gave him no alternative except to accept a plea agreement. Obviously, what is begged in that assertion is the very question to be decided. That is something, of course, that Johnson ought to prove. As Johnson correctly point out, it is a defendant's choice—not the defendant's attorney—whether to enter a plea of guilty or nolo contendere. See *State v. Rivera*, 277 Kan. 109, 117, 83 P.3d 169 (2004) (quoting *Winter v. State*, 210 Kan. 597, Syl. ¶ 1, 502 P.2d 733 [1972]). Nevertheless, Johnson now wants to abruptly ignore this responsibility—whether to enter a plea—and place the responsibility solely on Phillips. Surely Johnson should not be in a stronger position because of the passage of time than he would be in if he had told the trial court, during his plea hearing, about his desire to exercise his constitutional right to a jury trial and his misgivings about Phillips' representation in the case.

Indeed, despite Johnson's contention that he had no choice other than to enter a plea agreement, he told the trial court that no one had threatened him or had promised him anything to get

him to plead nolo contendere. In addition, Johnson told the trial court that he was satisfied with the representation that Phillips had furnished him in this case. Johnson's no choice assertion stands in stark contrast to the record and to the trial court's findings.

Based on the trial court's findings, which are supported by substantial competent evidence in the record, Johnson has failed to show that the representation rendered by Phillips was deficient. Although it is undisputed that Phillips was using cocaine during the time period that he was representing Johnson, the record establishes that Phillips was still able to represent Johnson in an effective manner and adequately advise him about his case. See *Green*, 274 N.J. Super. at 32 (" '[T]he right to counsel is the right only to the effective assistance of counsel, not to the best counsel.' [Citation omitted.]").

We determine that the trial court's findings sufficiently support its conclusion that Phillips was not ineffective. As a result, the trial court properly denied Johnson's K.S.A. 60-1507 motion.

Affirmed.