NOT DESIGNATED FOR PUBLICATION

No. 119,500

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RANDY ALLEN MARLER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Sumner District Court; JOHN E. SANDERS, judge. Opinion filed December 20, 2019. Affirmed.

*Richard Ney* and *David L. Miller*, of Ney, Adams & Miller, of Wichita, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., PIERRON and ATCHESON, JJ.

POWELL, J.: Randy Allen Marler appeals from the denial of his second K.S.A. 60-1507 motion. In his motion, Marler alleged he received ineffective assistance of counsel from several different attorneys—his trial counsel, his first 60-1507 counsel before the district court, and his first 60-1507 appellate counsel—and also alleged the State improperly suppressed evidence and cumulative error. After a thorough review of the record, we find no reversible error and affirm the district court's denial of Marler's second 60-1507 motion.

1

A.      *Marler's Underlying Criminal Case*

At the time of the crimes in 2007, Marler and Pam Marler were married and had two children:  a daughter, H.M., and a son, T.M. The relevant facts of Marler's underlying criminal case are set forth in the Kansas Supreme Court's opinion of his direct appeal:

> "The charges against Marler alleged that he committed sexual acts upon his 13-year-old daughter, H.M. The allegations were originally brought to light when Marler's wife, Pam, applied for a protection from abuse (PFA) order, in which she related that she had witnessed Marler having oral sex with H.M. Pam sought the PFA order a few days after Marler was arrested and incarcerated as a result of a fight with Pam.

> "After the PFA application, Pam and H.M. were interviewed about the sexual abuse incident. H.M. reported that, on a Sunday evening, her father had given her 1½ measuring cups of Nyquil, together with some pills, which made her drift in and out of a sleep-like state for the next 3 days. She recalled awakening in bed and discovering that she was naked and that Marler had his head between her legs, 'licking her "down there."' H.M. also recounted that on at least three other occasions Marler had touched her breasts and her crotch over the top of her clothing.

> "Pam related a similar version of the events, reporting that on a Sunday evening Marler had given H.M. Nyquil and a pill which she thought was either Valium or Xanex. The next day, upon returning home from picking up her son from school, Pam discovered Marler in bed performing oral sex on H.M. After she yelled at him to stop, Marler left the room, at which point Pam climbed into bed with H.M. She later awoke to find Marler in the bed, again performing oral sex on H.M. Pam was granted use and derivative use immunity for her trial testimony, and, at trial, she also testified about using methamphetamine with Marler.

"Captain Jeff Hawkins questioned Marler about the allegations. Marler related that both he and Pam had been using methamphetamines for several months and that during that time they both discussed having a sexual encounter with H.M. Marler claimed that it was Pam who provided the Nyquil and gave H.M. two or three Xanex tablets. He then reported that he took H.M. on an errand to Wichita and upon their return, Pam ordered H.M. to undress and get into bed. Marler alleged that Pam performed sex acts on H.M. He also stated that while Pam was picking up their son from school, he attempted to get back 'with the plan' by positioning his head between H.M.'s legs so it would look as though he was having oral sex with her when Pam came back into the room. Captain Hawkins asked Marler to draft a written statement, and Marler complied with the request, bringing a handwritten, eight-page statement to Hawkins the next afternoon. The statement recounted the events as Marler had described them to Captain Hawkins the day before. It also included multiple references to Marler's methamphetamine use, which he blamed for his conduct. Captain Hawkins videotaped as he reviewed with Marler the contents of the written statement.

"At trial, Marler recanted his written statement and claimed that he made it up in order to protect the children. His hope was that by implicating Pam, the children would be removed from her care. Accordingly, when the children were removed from the home and out of danger, he felt free to recant his false confession. However, Marler never objected to the introduction of his prior confessions." *State v. Marler*, 290 Kan. 119, 120-21, 223 P.3d 804 (2010).

Sean Shores represented Marler at trial.

B.      *Marler's Written Confession*

On April 20, 2007, Marler provided an eight-page handwritten confession to his crimes. Rather than summarize, we quote it verbatim:

3

"I.      Preface:

"I now see that only through complete honesty, can my family be healed. We need to tell the truth and turn back to God. I love my wife and kids more than life itself. I cannot bear the thought of a life without them. This statement may not be 100% accurate to everybody else's, but it is accurate to my memory. First and foremost; I was the instigator. My beloved wife would NEVER have participated in the sexual stuff without my manipulation. I would never have done them without the influence of METH! I beg God's, and my wife, and my children's, forgiveness. I was so wrong. Forgive me Pam. Forgive me [H.M.]. Forgive me [T.M.]. Lord forgive me.

"II.     Before Meth:

"For over 17 years, we loved each other very much. Pam and I were like two peas in a pod. We was very close with our kids. We occasionally fought, but I did not raise my hand to her.

"Pam and I were inseperable [*sic*], like one flesh. We used marajuana [*sic*] regularly, especially Pam, she needed it to calm her. We also occasionally used cocaine. We would buy a little for the weekend and have a fun time, and our lives would return to normal after a day of sleep. Pam would drink a moderate amount, but was no drunkard. I drank occasionally but mainly when we did cocaine. We spent lots of time with our kids, and we had a happy family. I miss my kids so. I miss my Pam so much.

"III.    Meth Arrives: Summer of '06

"Pam had went to Des Moines to look after her dad, like a good daughter would. I was playing my guitar a lot more and started playing with some younger crowd who smoked 'ice'. I tried it, and soon introduced Pam to it. God forgive me! Our sex lives became more intense, and I began to 'stretch the envelope'. I realize now that I manipulated Pam into doing things that she would never have done without meth.

"Pam was often very upset after doing these sexual things, because she was only doing them because she loved me. Forgive me, my Pam. I also did things that I regret,

4

like bringing [H.M.] into our sexual fantasies. I also manipulated Pam into SICK stuff like sex with animals. Please forgive me, my Beloved Wife. It was the meth. Sometime after Pam's Dad died, things just got out of control.

"IV.     At some point we was going to drug [H.M.] and have some 'sexual experimentation' with her. We were both foolishly involved with this. Pam gave [H.M.] some sex toys and a sex video. I gave [T.M.] a video also. I had talked to both of them about sex, but I had a <u>very</u> [explicit] and 'matter-of-fact' talk with [H.M.]. I had purchased the toys in Wichita. Weeks before the event, I tested for a dosage of what would make [H.M.] drowsy. Pam was <u>not</u> involved. I did not want us to hurt her, so I was very carefull [*sic*]. During this time we—I did, Pam knew[—]also put a Panasonic security camera in [H.M.]'s room. There was nothing [inappropriate] watched on it. The kids saw . . . the camera the next morning.

"I had prepared two doses of what I thought was enough to cause [H.M.] to pass out. Pam gave her the first dose before we left to go to Wichita. She instructed [H.M.] to take a second dose 'if needed' while we was gone. I gave her the second dose at the Belle Plaine rest area. I talked to Pam on the phone and we confirmed the plan. [H.M.] and I was to proceed to Wichita and Pam was to get ready for the 'evening'. [H.M.] and I went on our trip while Pam and I talked regularly on the phone. As I drove back I was overcome with guilt. I went as slow as I could, and took every 'long cut' that I could think of, trying to build up the courage to go through with it. When we returned, Pam was in the tub. She was also very upset by 'the plan', and she was upset because she thought I had been out doing stuff to [H.M.]. She was wrong. We fought until pretty late, and I was upset because she had 'backed out' after smoking some more meth. When I went to sleep. [H.M.] was in her bed, untouched.

"V.     As I proceed, keep this in mind. Pam only participated in any of this because she loved me, and was trying to please me. She believed that I wanted to have sex with my daughter also, she was wrong. I was also partly doing what I thought would ultimetly [*sic*] please her. If it were not for me . . . . none of this would have happened. If not for METH . . . . .

"I woke up the next morning to Pam yelling at [H.M.] to get her pants off and get in bed. [H.M.] was in a stupor and very drowsey [*sic*]. Pam gave her more drugs, and we tried to feed her breakfast. She ate some, but was very sleepy. I then remember Pam getting into bed. Pam and I both tried to arouse [H.M.] by fondling her, and Pam sucked her nipples. At one point I tried to have oral sex with her—I could not. So did Pam. Pam could not do it. As Pam watched, I inserted a vibrator into [H.M.]. We observed that she wasn't a virgin. Pam put her vagina against [H.M.]'s (as best she could) and tried to rub them together. She then attempted to have oral sex with her. [H.M.] swatted and kicked at her. She wanted to handcuff her and I refused. I said I would do nothing like that, and began to feel like I needed to protect [H.M.]. I held [H.M.] close to me as she slept. Pam was upset. At the time, I thought she was upset because I had 'stopped the plan'. I however certainly did not want [H.M.] to wake up, so I then gave her more drugs. In the afternoon, after we had been fighting all day Pam left to get [T.M.]. When I saw her returning, I attempted to show her that I was 'back on board' (and tried to get her back on board) with the plan by appearing to be having oral sex with [H.M.]. Even at that, I did not feel right, and stopped immediately. Pam was upset, as we both were. We were both upset because we could not go through with it, but yet we had committed ourselves already. Later, 8:00-9:00 PM, after smoking more meth, we tried again. Pam thought I wanted to have sex with [H.M.] without her, so she left the room for a while. I could not do it. When Pam returned, I told her that she was my wife, and there was no sex without her. She got in bed and had vaginal to vaginal sex with [H.M.]. She and I was upset by this. She took [H.M.] to bed. [H.M.] missed a couple of days of school, and we thought she did not remember.

"VI.     After that [H.M.] has never been touched again. However, meth had done it's [*sic*] damage. Pam and I fought because of both of our guilt. More than anything Pam was a victim of manipulation. A couple of months ago we fought and Pam left me. I found out that she had drank in [Des Moines]. She had lied to me about her promise not to. I got a few pieces of (questionable info) and used them to hold her to me by guilt. Even though I KNEW she had never been unfaithful to me. This is the greatest wrong that I ever did to Pam. We was still using meth. Pam please forgive me! I made such a HUGE mistake! At any rate, since we was still using, the cycle was continuing, I had bought a hidden camera off of e-Bay, and I was experimenting on putting it in [H.M.]'s room. I never taped anything inappropriate. Since then I see that getting arrested, and

6

clean, stopped a terrible cycle of the destruction of my marriage, and my family. These are the things that Satan, and meth once had on me. To cause these terrible fights.

"VII.    I now know that there is only 1 thing in this world that my wife and daughter would be interested in:  my complete and total honesty. Yesterday, I saw Pam mouth the words to [H.M.]:  'We have to tell the truth so things can get better'. I thought about the wisdom in my wife's words, all night long. I will NEVER lie to her again. Also, I will never manipulate her again. My wife, by this, will know that I have changed. All of this terrible situation rests squarely on me. NOT MY WIFE! I want to heal my family. I will take drug rehab, family counseling, anger management, whatever it takes. I only want to take that good job with insurance, and 401K plan, and security for my wife and kids. I want us to have a nice home, car, and my wife and kids to have nice things.

"VIII.   Everyone tells me that I have lost my family. They tell me Pam has moved on. I know she has not. I know she is the only person in this world that truely [*sic*] loves me. She also knows how much I love her. I pray to God every day to help her see that it can be the same. She will put her wedding band back on. Pam is my only lover for life."

Shores did not object to the admission of this confession at trial. The jury convicted Marler of rape, aggravated indecent liberties with a child under age 14, and endangering a child. Marler was sentenced to two consecutive hard 25 life sentences.

C.    *Marler's Direct Appeal*

Marler directly appealed his convictions and sentences and was represented by Rachel Pickering. Marler challenged the admission of the evidence of his prior drug use under K.S.A. 60-455, the limiting jury instruction given on that drug use, the denial of his sentencing departure motion, and the constitutionality of his sentences as being disproportionately severe in violation of the Eighth Amendment to the United States Constitution's prohibition of cruel and unusual punishment.

The Kansas Supreme Court did not address Marler's argument concerning the admission of the K.S.A. 60-455 drug evidence because Shores had not preserved the issue for appeal. 290 Kan. at 123. The court also did not address the unconstitutionality of Marler's sentence because "Marler did not even suggest to the district court that he was claiming an unconstitutionally disproportionate sentence." 290 Kan. at 128. Ultimately, our Supreme Court affirmed his convictions and sentences. 290 Kan. at 129.

D.      *Marler's First 60-1507 Motion*

Following his direct appeal, Marler filed a pro se 60-1507 motion and brief in support that was over 100 pages long. The motion alleged his trial counsel, Shores, was ineffective by failing to properly prepare and investigate the case, failing to properly develop a reasonable defense strategy, using mind-altering substances at least during preparation of this case, failing to address a defective complaint, and being guilty of ethical violations.

Kerwin Spencer was appointed as Marler's 60-1507 counsel before the district court. The district court conducted a two-day evidentiary hearing on Marler's motion. After the hearing, Spencer filed a citation of legal authorities concerning issues relevant to the use of Marler's statements at trial.

The district court issued a 70-page decision denying Marler's 60-1507 motion, addressing at length the evidence presented at trial and Shores' failure to (1) seek a bill of particulars; (2) file a motion to suppress Marler's confession; (3) move to admit the video of Marler's statements on April 19, 2007, if the confession was admissible; (4) move to admit Marler's written letter on April 25, 2007, recanting his confession, if the confession was admissible; (5) move to admit phone records; (6) object to the admission of evidence of other crimes at trial; (7) raise the issue regarding the lack of the element of the age of Marler in the complaint; (8) file a motion for judgment of acquittal after the State's case-

8

in-chief; (9) submit a proposed K.S.A. 60-455 instruction; (10) prepare for trial; (11) meet more often with Marler; (12) raise cruel and unusual punishment arguments at Marler's sentencing; (13) file a more in-depth motion for a new trial; and (14) put documents from a related child-in-need-of-care case into evidence.

Marler appealed the denial of his first 60-1507 motion to this court. Gerald E. Wells was appointed to represent Marler and narrowed his numerous claims into four: (1) Shores' failure to file a motion to suppress Marler's confession; (2) Shores' failure to object to the introduction of Marler's drug use; (3) Shores' failure to contest the State's failure to prove Marler's age; and (4) Shores' failure to argue his consecutive hard 25 sentences amounted to cruel and unusual punishment.

After reviewing the entire record, including the interviews, the panel held, first, that "even if Shores had moved to suppress Marler's confession, it would have been unsuccessful" because the confession was "the product of his free and independent will." *Marler v. State*, No. 108,722, 2013 WL 5870049, at *7 (Kan. App. 2013) (unpublished opinion). Second, Shores' decision not to object to Marler's prior drug use was a strategic decision and not deficient performance. Third, the evidence at trial established Marler was over the age of 18 when he committed the crimes. 2013 WL 5870049, at *7-9. Fourth, applying the factors in *State v. Freeman*, 223 Kan. 362, 574 P.2d 950 (1978), to assess the constitutionality of Marler's sentence, the panel found "no reasonable probability that Marler would have prevailed in arguing that his hard 25 sentences were cruel and unusual." 2013 WL 5870049, at *13. The panel found no error on the part of Shores and denied relief on all grounds. 2013 WL 5870049, at *13.

E.     *Marler's Second 60-1507 Motion*

After being denied relief on his first 60-1507 motion, Marler retained his present counsel, Richard Ney, to pursue another 60-1507 motion. In his amended 60-1507

9

motion, Marler raised 11 issues, the majority of which fault Shores' representation at trial, Pickering's representation on direct appeal, Spencer's representation before the district court on Marler's first 60-1507 motion, and Wells' representation on the appeal of the denial of Marler's first 60-1507 motion. Specifically, Marler argued he was denied his statutory right to the effective assistance of habeas counsel when Spencer failed to raise the issue that Shores was ineffective for: (1) failing to suppress Marler's written and oral statements based upon a violation of his right to counsel; (2) failing to object, under the corpus delicti rule, that Marler's uncorroborated confession to the rape and aggravated indecent liberties with a child charges was insufficient to sustain those convictions; (3) failing to timely communicate the State's plea offer to Marler; and (4) failing to object to or eliciting highly prejudicial prior bad acts evidence that Marler physically abused Pam, that he ran from law enforcement after their domestic dispute, and that he had pornography on his computer. Marler also argued he was denied his statutory right to the effective assistance of habeas counsel when Spencer: (5) failed to raise the issue that Pickering was ineffective in failing to raise a sufficiency of the evidence issue as to Marler's convictions of rape and indecent liberties on direct appeal based upon the corpus delicti rule; (6) failed to introduce available evidence of Shores' overall incompetency, including that Shores was under the influence of mind-altering substances at the time of Marler's trial and was facing disbarment at the time of Marler's first 60-1507 hearing; and (7) failed to thoroughly investigate the case, interview witnesses, and adequately prepare for the first 60-1507 evidentiary hearing. Additionally, Marler argued: (8) he was denied his statutory right to the effective assistance of appellate habeas counsel when Wells failed to raise Spencer's ineffectiveness at the district court's 60-1507 evidentiary hearing or request a remand for a full consideration of all issues of ineffective assistance of counsel; (9) he was denied his statutory right to the effective assistance of habeas counsel when Spencer failed to fully investigate the case by failing to obtain the tape-recorded interview of Pam that significantly impeached Pam's trial testimony; (10) he was denied his statutory right to effective assistance of habeas counsel by the cumulative effect of the errors and omissions made by both Spencer and Wells because they incompetently failed

10

to assert Marler's legitimate Sixth Amendment to the United State Constitution ineffective assistance of counsel claims against Shores and Pickering; and (11) the prosecutor suppressed a tape-recorded interview of Pam that contained material, exculpatory evidence.

The district court held a two-day evidentiary hearing on the motion. At the hearing, 13 witnesses testified and 18 exhibits were ultimately admitted. The district court issued a 33-page written opinion denying Marler's motion.

Marler timely appeals.

ANALYSIS

On appeal, Marler raises nine arguments. Rather than briefly introduce each of these up front, we will discuss Marler's arguments in order.

Our standard of review applicable to Marler's contentions of error is well known. The district court has three options when reviewing a K.S.A. 60-1507 motion:

> "'(1) The court may determine that the motion, files, and case records conclusively show the prisoner is entitled to no relief and deny the motion summarily; (2) the court may determine from the motion, files, and records that a potentially substantial issue exists, in which case a preliminary hearing may be held. If the court then determines there is no substantial issue, the court may deny the motion; or (3) the court may determine from the motion, files, records, or preliminary hearing that a substantial issue is presented requiring a full hearing.' [Citation omitted.]" *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

The standard of review depends upon which of these options a district court utilizes. 300 Kan. at 881. After a full evidentiary hearing on a 60-1507 motion, as was the

11

case here, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2019 Kan. S. Ct. R. 228). "An appellate court must give deference to the district court's findings of fact, accepting as true the evidence and any inferences that support or tend to support the district court's findings." *Bellamy v. State*, 285 Kan. 346, 355, 172 P.3d 10 (2007). We review the district court's findings of fact to determine whether they are supported by substantial competent evidence and are sufficient to support the court's conclusions of law. Our review of the district court's ultimate conclusions of law is de novo. 285 Kan. at 355.

I.   WAS MARLER DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF HABEAS COUNSEL WHEN SPENCER FAILED TO INTRODUCE AVAILABLE EVIDENCE OF SHORES' OVERALL INCOMPETENCY?

First, Marler argues that he was denied his right to effective assistance of habeas counsel when Spencer failed to introduce available evidence of Shores' overall incompetency. Specifically, Marler claims that Shores was on mind-altering substances at the time of trial, which led Shores' representation of Marler to be deficient, and Spencer was ineffective for failing to raise this issue in Marler's first 60-1507 motion. The State responds that the district court never concluded that Shores was under the influence of mind-altering substances at the time of Marler's trial, making Marler's claim meritless.

Essentially, Marler's argument requires two showings of ineffective assistance of counsel. Marler must first show that Shores was ineffective, then Marler must show that Spencer was ineffective for failing to raise Shores' ineffectiveness. If Shores was not ineffective, then Marler's allegation that Spencer was ineffective cannot succeed.

To prevail on a claim of ineffective assistance of counsel, "a criminal defendant must establish (1) the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, *i.e.*, that there is a reasonable probability the jury

12

would have reached a different result absent the deficient performance." *Sola-Morales*, 300 Kan. at 882; see *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance. See *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014). To establish prejudice, the defendant must show a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different, with a reasonable probability meaning a probability sufficient to undermine confidence in the outcome. See *State v. Sprague*, 303 Kan. 418, 426, 362 P.3d 828 (2015).

Senior Judge John E. Sanders presided over the evidentiary hearing on Marler's second 60-1507 motion. The evidence presented at that hearing revealed Shores suffered from bipolar disorder and anxiety issues. He also had issues with recurrent kidney stones. He used Seroquel and Xanax for the mental disorders and "used and abused" Dilaudid, Morphine, Lortab, and Percocet.

District Judge William R. Mott presided over both Marler's criminal trial and first 60-1507 evidentiary hearing. Judge Mott testified that he did have some frustration with Shores showing up for hearings, but that was not an unusual experience with some Wichita attorneys not wanting to come down to Sumner County. He described an incident shortly before trial when Shores called and requested a continuance due to a bout with kidney stones. Judge Mott recalled that Shores was hurting, and he may have been on painkillers so he did not want to drive, and Judge Mott granted the continuance. On the phone, Shores "was a little weak, sounded kind of timid, a tick slow, sluggish." However, Judge Mott did not have any concerns about or knowledge of the possibility of Shores abusing medications.

13

Further, Judge Mott did not notice anything about Shores' trial performance that caused him concerns about Shores being on medications. Judge Mott did correct Shores several times about vague or compound questions but that was "a general problem we have in our bar now. That people don't have enough trial experience." He did not witness anything when Shores appeared before him to cause him to believe that he was impaired.

Shores' ex-wife also testified. She and Shores married in April 2008, and the Marler trial was the next month. She testified that before their marriage Shores used painkillers on a monthly basis and also used marijuana. She said they went to the emergency room a lot for Shores' kidney stones and that they were confirmed with CT scans. During the early months of their marriage—April, May, June—Shores would occasionally take painkillers, but she did not recall seeing Shores slur his speech during this period, as he frequently did late in their marriage when he started taking different and stronger medications. She testified that Shores' behavior started to get worse around five months into their marriage, which was after the Marler trial.

Shores' former legal assistant testified as well. She worked for Shores from June 2005 until September 2009. She believed Shores did suffer from kidney stones because she had witnessed him lying on the floor of his office in pain from the stones and that he abused the painkillers he was prescribed for the kidney stones. She stated that Shores had difficulty in responding to calls and attending court appearances, but those difficulties were in the last six months to a year that she worked for him—after the Marler trial. Like Shores' ex-wife, she could not recall if Shores was having difficulties during the time of the Marler trial.

Finally, Spencer testified. He recognized that proving something wrong with Shores' representation of Marler was Marler's best opportunity to prevail on his 60-1507 motion. However, Spencer testified he did not find deficiencies with Shores' representation of Marler.

14

"[T]he material issue [was] whether or not there was a deficit in [Shores'] courtroom performance. And it might be relevant in evaluating that whether or not he was under the influence of drugs or not at the time. But even if he were under the influence of drugs, if his courtroom performance was satisfactory, then it's not a material issue."

Unfortunately, the best witness available to speak to the topic—Shores himself—died shortly after the filing of Marler's second 60-1507 motion. Also of note, disbarment proceedings against Shores were commenced in May 2011, some three years after Marler's trial. Marler's first 60-1507 motion was filed in January 2011 and denied in April 2012 while Shores' disbarment was pending. The Kansas Supreme Court disbarred Shores on July 6, 2012. *In re Shores*, 294 Kan. 680, 279 P.3d 710 (2012).

Judge Sanders acknowledged that determining Shores' effectiveness in light of his alleged drug use would be difficult because he was not the trial judge in Marler's underlying criminal case and did not have the opportunity to observe Shores' actions first-hand during all phases of the trial. He gave great weight to Judge Mott's testimony as being "the most reliable as to [Shores'] physical and mental condition at trial."

The district court adopted the State's summary in its proposed findings of fact and conclusions of law. That summary reads:

"The imperfect man was no perfect attorney. Not infrequently, Shores appeared late in court. Not infrequently, Shores altogether failed to appear in court when expected. Others' attempts to contact Shores failed, with some frequency. And he occasionally might not visit the office for days, though he sometimes carried on his work at home. Once periodic, Shores' shortcomings recurred more and more often. In the late summer of 2009, Shores['] recurrent problems worsened enough to end his marriage and cause his secretary to quit. By September 2010, Sumner County removed Shores from certain appointment lists. In May 2011, disciplinary proceedings commenced against Shores. And in July 2012, the accumulated complaints made by two judges, 3 former clients, and the disciplinary administrator resulted in Shores' disbarment."

15

The district court "ha[d] no doubt that Shores was struggling with drugs during the times he represented Marler." Ultimately, the district court concluded that it was "almost impossible to determine when and if at any particular time (except for the phone hearing on March 8, 2008, concerning the continuance) Shores may have been acting under the influence while working on Marler's case either beforehand or during the trial." A review of the record on appeal indicates that this conclusion was based on substantial competent evidence.

In denying Marler's second 60-1507 motion, the district court found:

"The 'substance abuse issue' has caused the Court a great deal of concern. The thought of an attorney representing a defendant while under the influence of incapacitating drugs and providing incompetent representation in *any* trial as a result, let alone one that carried the specter of two 'hard 25' consecutive sentences as did Marler's case, is any judge's worst nightmare."

Given the testimony, the district court could not find fault with Spencer's representation of Marler during his 60-1507 motion and held:

"The Court doubts that the generalized testimony from the above witnesses who were unable to definitively link prior evidence of drug use to Shore[s'] courtroom performance would have produced 1507 relief. From the testimony of [Shores' former legal assistant] above, it appears likely that Shores['] drug use eventually led to a dramatically worse deterioration in Shores['] professional performance *after* the Marler trial.

"While the Court has no doubt that Shores struggled with a drug addiction, the evidence in this case is sufficiently conflicted or so vague to the point that it becomes virtually unknowable how or if Shores['] drug use affected his performance. The personal observations by Judge Mott of Shores' performance during the Marler case from start to finish weigh[] heavily against Marler's contentions in regard to this issue. The Court finds that Spencer caused Marler no prejudice."

16

We are unpersuaded by Marler's arguments concerning Spencer's alleged ineffectiveness. First, Marler essentially asks us to reweigh the evidence presented at the evidentiary hearing, to give more credibility to Marler's testimony than Judge Mott's, and to find that Shores was impaired during his representation of Marler, making his performance deficient. However, we cannot "reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence." *State v. Llamas*, 298 Kan. 246, 254, 311 P.3d 399 (2013).

Second, because Spencer and the district court determined that Shores had not been ineffective in his representation of Marler at trial, Spencer was not deficient for not raising Shores' drug use. Importantly, "a defense attorney's use of drugs or alcohol does not establish ineffective assistance of counsel per se." *Johnson v. State*, 42 Kan. App. 2d 1057, 1066, 221 P.3d 1147 (2009), *rev. denied* 291 Kan. 912 (2010); see *Neth v. State*, No. 100,618, 2010 WL 744790, at *3 (Kan. App. 2010) (unpublished opinion) (holding that despite defense counsel's confirmed drug use at time of trial counsel was not ineffective because counsel's representation at trial was appropriate); *Jones v. State*, No. 90,390, 2004 WL 2085584, at *5 (Kan. App. 2004) (unpublished opinion) (holding defendant had not shown attorney's performance was deficient even if court assumed attorney was using cocaine at time of trial); see also *State v. Wallace*, 258 Kan. 639, 646, 908 P.2d 1267 (1995) (holding defense attorney's violation of lawyer ethics rules does not by itself establish constitutionally ineffective counsel; defendant still must show attorney's work was below standards).

Marler had to establish that Shores' representation was below standards, not just that Shores was using drugs at the time of Marler's trial. "'[O]nly by pointing to specific errors made by trial counsel'" can a defendant prove ineffective assistance of counsel. *State v. Cheatham*, 296 Kan. 417, 434-35, 292 P.3d 318 (2013) (quoting *United States v. Cronic*, 466 U.S. 648, 666, 104 S. Ct. 2039, 80 L. Ed. 2d 657 [1984]). Marler fails to do

so. Therefore, Spencer was not deficient for failing to raise this issue in Marler's first 60-1507 motion. Marler has not satisfied the first requirement of the *Strickland* test.

II.      WAS MARLER DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF HABEAS COUNSEL WHEN SPENCER FAILED TO CHALLENGE THE ADMISSIBILITY OF MARLER'S CONFESSION?

Marler next argues—another multilayered claim of ineffective assistance of counsel—that Spencer was ineffective for failing to assert Shores' ineffectiveness for not challenging the admissibility of his confession at trial. Specifically, he argues that his confession was inadmissible because he invoked his right to counsel and, therefore, Shores should have argued his confession was inadmissible under *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). The admissibility of Marler's confession was addressed—albeit on different grounds—in Marler's appeal of his first 60-1507 motion. The prior panel described Marler's interview and confession with Captain Jeff Hawkins as follows:

> "Captain Hawkins conducted two interviews with Marler. The first interview took place on April 19, 2007, and the second one took place on April 20, 2007. Prior to the April 19 interview, Hawkins provided Marler with oral and written *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Marler waived his *Miranda* rights and agreed to speak with Hawkins. At the end of the April 19 interview, Marler agreed to make a statement in writing and told Hawkins that he would let Hawkins know when he was finished. The following day, April 20, Marler notified Hawkins through the jail staff that Marler wanted to see him. Hawkins met with Marler, and Marler gave Hawkins his written statement. Hawkins again provided Marler with oral *Miranda* warnings, which Marler waived, agreeing to speak with Hawkins about the written statement. Marler's eight-page written statement was admitted into evidence at trial without objection." *Marler*, 2013 WL 5870049, at *3.

18

Marler claims that at the end of his first interview with Hawkins he stated, "Well, I need my court appointed lawyer, or whatever, to make a deal." However, this is not Marler's entire statement, and the context of his statement is important.

First, before making this statement, Marler had already agreed to write a statement and give it to Hawkins. Marler was then trying to figure out if his cooperation could result in a bond modification to permit him to work. After the pair left the interview room, Hawkins explained that he could only tell the county attorney what happened but does not make recommendations. Marler then made the following comment: "Well, I need to get my court appointed lawyer, or whatever, and have them try to work some deal then or something. Is that how that works?"

At Marler's first 60-1507 evidentiary hearing, Shores testified that he did not move to suppress the confession because Marler's statement was, in his opinion, far beyond the scope of requesting an attorney and caselaw did not support suppression on that ground. Spencer testified he did not raise the issue because he believed Marler's mention of an attorney was in the nature of something he wanted to do in the future, not that Marler was saying he wanted an attorney right at that moment or would not speak further without one.

The district court held that Marler could not show prejudice because the confession was admissible and neither the outcome of the trial nor the first 60-1507 motion would have been affected by either Shores or Spencer raising the issue.

As to the propriety of Marler's confession,

"[i]t is well settled that the Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to remain silent and the right to have an attorney present during custodial interrogation. *State v. Walker*, 276 Kan.

19

939, 944, 80 P.3d 1132 (2003) (citing *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966]). We have held that if the accused has unambiguously invoked the right to counsel, questioning must cease immediately and may be resumed only after a lawyer has been made available or the accused reinitiates the conversation with the interrogator. *Walker*, 276 Kan. at 946. But if the accused's request is ambiguous, the interrogator may ask clarifying questions. 276 Kan. at 945." *State v. Salary*, 301 Kan. 586, 604, 343 P.3d 1165 (2015).

The right to counsel may be invoked at any time. *State v. Walker*, 276 Kan. 939, 944, 80 P.3d 1132 (2003). "To successfully invoke the right, the accused must, at a minimum, make '"some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police."' 276 Kan. at 944 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 115 L. Ed. 2d 158 [1991])." *Salary*, 301 Kan. at 604. If there is a successful invocation of the right to counsel, all statements made after the invocation of the right to counsel must be suppressed. See *Walker*, 276 Kan. at 945, 953.

There are two inquiries to be made when determining if a defendant has successfully invoked his right to counsel: "First, the suspect 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' . . . Second, the request must be for assistance with the custodial interrogation, not for subsequent hearings or proceedings." 276 Kan. at 945.

Under the first inquiry,

"an objective standard is applied in determining if the statements by the accused '"can reasonably be construed to be an expression of a desire for the assistance of an attorney."' *Davis*, 512 U.S. at 459 (quoting *McNeil*, 501 U.S. at 178). If the desire for counsel is presented 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney,' no ambiguity or equivocation

20

exists, and all questions must cease. *Davis*, 512 U.S. at 459. . . . When the accused makes an ambiguous statement about asserting his or her right to remain silent or to speak with counsel, it is good practice for the interrogator to ask clarifying questions; however, it is not required and the questioning may continue. *Davis*, 512 U.S. at 459-60; *State v. Caenen*, 270 Kan. 776, 787-88, 19 P.3d 142 (2001); *State v. Speed*, 265 Kan. 26, 37-38, 961 P.2d 13 (1998)." *Walker*, 276 Kan. at 945.

In *Edwards*, the defendant attempted to work out a deal with the police. The police told him they could not make any deals and they gave him the phone number of the county attorney. The defendant called the county attorney but hung up a short time later. The defendant then stated: "'I want an attorney before making a deal.'" 451 U.S. at 479. The following day, new detectives initiated a conversation with Edwards after giving him another *Miranda* warning. The United States Supreme Court held that Edwards' statement at the end of the first interview was a sufficient invocation of his *Miranda* rights and, thus, Edwards' statements made during the second interview must be suppressed because counsel had not been made available to him after his invocation the previous day. 451 U.S. at 487.

However, questioning of a defendant can continue if the defendant's reference to an attorney "is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the [defendant] *might* be invoking the right to counsel." *Davis v. United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). After a suspect has waived his or her *Miranda* rights, "law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." 512 U.S. at 461. Further, "[a]n indication by the defendant that he will only want counsel at some future time or for some other purpose is not an assertion of the right to counsel." 2 LaFave, Criminal Procedure § 6.9(g) (4th ed. 2015). The statements in the following cases have been found to insufficiently invoke the right to counsel: *Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer."); *State v. Mattox*, 305 Kan. 1015, 1037, 390 P.3d 514 (2017) ("You all care if I get a lawyer in here?"); *United States v. Mohr*,

21

772 F.3d 1143, 1145 (8th Cir. 2014) ("Should I get a lawyer at this time? . . . I think I should get one."); *United States v. Wysinger*, 683 F.3d 784, 789 (7th Cir. 2012) ("Do I need a lawyer?"); *Henness v. Bagley*, 644 F.3d 308, 319 (6th Cir. 2011) ("I think I need a lawyer."); *United States v. Montes*, 602 F.3d 381, 385 (5th Cir. 2010) ("Maybe I should get an attorney" or "Do I need an attorney?"); *Robertson v. State*, 347 S.W.3d 460, 462 (2009) ("Do I need a lawyer?"). In contrast, the statements in the following cases have been deemed a sufficient invocation of the right to counsel: *Salary*, 301 Kan. at 605 ("I do want a lawyer."); *United States v. Hunter*, 708 F.3d 938, 940 (7th Cir. 2013) ("Can you call my attorney?"); *Wood v. Ercole*, 644 F.3d 83, 87 (2d Cir. 2011) ("I think I should get a lawyer."); *People v. Lynn*, 278 P.3d 365, 367 (Colo. 2012) ("When can I talk to a lawyer?"), *overruled on other grounds by People v. Kutlak*, 364 P.3d 199 (2016); *Wheeler v. State*, 289 Ga. 537, 537, 713 S.E.2d 393 (2011) ("I need to discuss it with a lawyer before I . . . talk to you.").

Here, Marler's statement—"Well, I need to get my court appointed lawyer, or whatever, and have them try to work some deal then or something. Is that how that works?"—was not an unequivocal request for counsel. This statement is similar to the statements above in which the defendants ask if they need a lawyer rather than state they want a lawyer. Marler was asking if he needed a lawyer to work out a deal with his bond so he could return to work. Further, even if this was an invocation of the right to counsel, Marler fails on the second inquiry.

When looking to the second inquiry of the test, "the court may look at '[t]he timing as well as the content and context of a reference to counsel [to] help determine whether there has been an unambiguous assertion of the right to have the assistance of an attorney in dealing with a custodial interrogation by law enforcement officers.'" *Salary*, 301 Kan. at 605.

Here, Marler's statement was not a request for an attorney in dealing with the custodial interrogation by law enforcement officers. Instead, this was a request to have an arrangement made with Marler's bond so he could return to work, not to have an attorney present during Marler's discussions with the police. Marler's comment occurred at the end of the interrogation as Marler was leaving the room.

Additionally, even if Marler had satisfied the two requirements that his request for counsel was unambiguous and for the custodial interrogation, his *Edwards* violation claim still fails because he reinitiated discussions with police and again waived his right to counsel, effectively waiving the previous invocation of the right to counsel. See *State v. Thurber*, 308 Kan. 140, 154-55, 420 P.3d 389 (2018). Here, Marler reinitiated contact when he told the jailers the next morning that he wanted to see Hawkins and that his written confession was ready. At the beginning of his second contact with Hawkins he was again informed of his *Miranda* rights and again waived his right to counsel. Although the district court did not rely on this ground to find Marler's claim meritless, we will uphold the district court's decision if it was right for any reason. *Gannon v. State*, 302 Kan. 739, 744, 357 P.3d 873 (2015). Marler's claim under *Edwards* fails.

Marler also argues his statutory right to counsel under K.S.A. 22-4503 was violated and Spencer was ineffective for not raising the issue in his first 60-1507 motion. K.S.A. 22-4503(a) reads in relevant part: "A defendant charged by the state of Kansas in a complaint, information or indictment with any felony is entitled to have the assistance of counsel at every stage of the proceedings against such defendant."

At the time of his statements to law enforcement Marler was being held on another matter. The record does not reflect that he had been charged by the State in a complaint, information, or indictment at that time, and Marler does not direct us to any such charge. His argument appears to rest on flawed readings of *State v. Lawson*, 296 Kan. 1084, 297 P.3d 1164 (2013), and *State v. Betancourt*, 301 Kan. 282, 342 P.3d 916 (2015). While

23

Marler is correct that *Lawson* does hold that once the statutory right to counsel attaches, waiver of counsel must be done in open court, *Lawson* does not support a conclusion that a defendant has a statutory right to counsel before being charged in the case. 296 Kan. at 1098. *Lawson* also states that K.S.A. 22-4503 mirrors the critical stages of the proceeding under the Sixth Amendment. 296 Kan. at 1096. The Sixth Amendment is case-specific and would not have applied to Marler's sex crimes against H.M. because Marler had not yet been charged with those crimes at the time of his statements. See *Texas v. Cobb*, 532 U.S. 162, 172, 121 S. Ct. 1335, 149 L. Ed. 2d 321 (2001) ("[T]he Sixth Amendment right to counsel attaches only to charged offenses.").

Marler also cites *Betancourt*, 301 Kan. at 295, to support his claim that the statutory right to counsel under K.S.A. 22-4503 can be invoked during any police-initiated interrogation and before an accused is criminally charged. We disagree with Marler's interpretation. The *Betancourt* court actually held that the defendant had no statutory or Fifth Amendment right to counsel because the defendant did not invoke that right. 301 Kan. at 296.

Marler has not established that a statutory violation of his right to counsel occurred here. As such, Marler has failed to show that Spencer was ineffective for not arguing that Shores was ineffective for failing to argue that Marler's statements should have been suppressed due to a violation of Marler's constitutional or statutory right to counsel. There was no error.

III.     DID THE NONDISCLOSURE OF PAM'S RECORDED INTERVIEW AMOUNT TO A *BRADY* VIOLATION?

Third, Marler argues that the State failed to disclose a tape-recorded interview of Pam that contained exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, Marler complains that the State

24

failed to turn over a recording of a May 1, 2007 interview of Pam. We exercise de novo review over the existence of a *Brady* violation but give deference to the district court's finding of fact. *State v. DeWeese*, 305 Kan. 699, 709, 387 P.3d 809 (2017).

To establish a *Brady* violation Marler must show: (1) the evidence was favorable because it is exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the evidence is "'material so as to establish prejudice.'" 305 Kan. at 710.

Marler argues that in the interview "Pam admitted to participation in the incident with H.M." In the taped interview, Pam admits to helping carry H.M. from the couch into Marler and Pam's bedroom, smoking methamphetamine, and getting into bed with Marler and H.M. She also states she did not think that she sucked on H.M.'s nipple and that she knew Marler was going to do sexual things to H.M. Marler argues this contradicts Pam's claim that she had nothing to do with the abuse, and thus admission of the tape would have been detrimental to her credibility.

However, as the district court held, the evidence in the interview was far from favorable to Marler, and thus, the inculpatory evidence in the interview outweighed the weak impeachment value. This evidence included: (1) odd and inappropriate interactions between Marler and H.M. (such as Marler telling H.M. he wanted her to practice putting condoms on him, telling H.M. to touch his penis, and having H.M. sit on his lap and touching her); (2) Marler's expanding sexual fantasies (progressing from "girl-on-girl" to wanting Pam to involve their dog in sex acts to wanting H.M. involved); (3) Marler's February evening road trip with H.M.; (4) Pam and Marler fighting after Marler returned from that road trip with a visibly unsteady H.M.; (5) Pam and Marler fighting the following day before Pam left to pick up T.M. from school and fighting again when Pam returned home to see Marler positioned to perform oral sex on H.M.; (6) fighting more and smoking more meth with Marler that evening; (7) H.M. and T.M. receiving Nyquil from Marler; (8) Marler giving H.M. Valium or Xanax; (8) Marler commenting to Pam

25

that H.M. was not a virgin; (9) and Marler making comments that in some places it is normal to sell daughters for prostitution and not being bothered by a neighbor going to prison for molesting his daughter. Importantly, throughout the interview, Pam strenuously denied engaging in any sexual acts with H.M.

This inculpatory evidence outweighs any minimal impeachment value of the interview. Thus, any use of the interview by defense counsel would have likely harmed Marler, not helped him. Marler has failed to establish the first requirement of a *Brady* violation.

Also important is that the district court never made a finding that the State had suppressed the videotape. Although Marler asserts that it is undisputed that the State did not disclose the tape until August 2016, he points to no evidence establishing that the State agreed the tape was not timely disclosed. His only factual support for his contention that the tape was suppressed is that Spencer did not have the tape and Marler claimed to have never seen the tape. This does not mean the tape was never disclosed to Shores. We cannot assume the videotape was suppressed given the record on appeal. We see no *Brady* violation.

IV. DID MARLER RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS ATTORNEYS DID NOT RAISE A SUFFICIENCY OF THE EVIDENCE ISSUE AS TO MARLER'S CONVICTIONS OF RAPE AND INDECENT LIBERTIES UNDER THE CORPUS DELICTI RULE?

Next, Marler argues that his attorneys at multiple different points in his representation were ineffective for failing to argue sufficiency of the evidence based on the corpus delicti rule. In essence, Marler argues that his confession alone was insufficient to support his convictions. Specifically, Marler argues that Spencer was ineffective for failing to assert Shores' ineffectiveness for failing to argue that Marler's

26

uncorroborated confession to the rape and aggravated indecent liberties with a child charges was insufficient to sustain those convictions. He also argues that Spencer was ineffective for failing to assert Pickering's ineffectiveness for failing to raise the corpus delicti issue on direct appeal.

Like his other claims of ineffective assistance of counsel, if Shores was not ineffective for failing to raise the corpus delicti rule, then Marler's argument that Pickering and Spencer were ineffective for failing to raise Shores' failure to raise the corpus delicti issue at trial cannot succeed because he cannot show prejudice.

"Corpus delicti is Latin for 'body of the crime.' It refers to the basic injury in a crime, such as the death in a murder, and a showing that this injury resulted from criminal activity." *State v. Dern*, 303 Kan. 384, Syl. ¶ 5, 362 P.3d 566 (2015). "In Kansas, the State may satisfy its burden to make a prima facie showing of the corpus delicti through a trustworthy extrajudicial confession or admission to any crime that does not naturally or obviously produce a tangible injury easily susceptible to physical proof." 303 Kan. 384, Syl. ¶ 7.

> "A determination of trustworthiness will depend on the totality of the circumstances and may include a consideration of the following nonexclusive factors or indicia of reliability: (1) independent corroboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and, (6) if the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length.

"The evidentiary standard for finding a confession or admission sufficiently trustworthy to satisfy the State's obligation to present a prima facie showing of the corpus delicti is akin to the standard of review applicable to sufficiency of the evidence claims— *i.e.*, it asks whether, viewed in the light most favorable to the prosecution, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged crime actually occurred." 303 Kan. at 410-11.

"A conviction of even the gravest offense may be sustained by circumstantial evidence," and this is true when it comes to the independent evidence necessary to satisfy the corpus delicti rule:

"The quantum of independent evidence necessary to corroborate the corpus delicti in a criminal prosecution relying upon the extrajudicial confession of an accused need not be great. So long as there is some evidence which renders the corpus delicti more probable than it would be without the evidence, the essential purposes of the independent evidence rule have been served." *State v. Bradford*, 254 Kan. 133, Syl. ¶¶ 1-2, 864 P.2d 680 (1993).

Marler takes issue with both his rape and aggravated indecent liberties with a child convictions and the corpus delicti supporting them. First and foremost, "the *corpus delicti* in a rape case may be proved by extrajudicial admissions and circumstantial evidence." *State v. Higdon*, 224 Kan. 720, 723, 585 P.2d 1048 (1978). Similarly, the Kansas Supreme Court applied this standard to a conviction of indecent liberties with a child in *State v. Tillery*, 227 Kan. 342, 346, 606 P.2d 1031 (1980).

In *Tillery*, the defendant was convicted of indecent liberties with a child after admitting to kissing a four-year-old child on the mouth, lips, and vagina and to rubbing his penis on her. During this same extrajudicial admission, Tillery reported that he removed his shirt before the sexual abuse, lost his shoes during his flight from the victim, and generally smoked Pall Mall unfiltered cigarettes. On appeal, he argued that, under the

corpus delicti rule, no evidence corroborated the sexual contact admitted to in his confession and no witnesses identified Tillery at trial. Still, evidence corroborated other details of his confession to satisfy the corpus delicti rule: eyewitnesses saw a shirtless man kneeled over a victim with her underwear askew, and the man ran away when others approached and left behind shoes and a shirt containing Pall Mall unfiltered cigarettes. This circumstantial corroboration of the less-incriminating aspects of Tillery's confession made his confession's incriminating aspect believable, and the Supreme Court affirmed his conviction. 227 Kan. at 346-47.

Marler argues his confession was not reliable under the trustworthiness standard. However, there was sufficient circumstantial evidence to corroborate Marler's confession. The State provided a lengthy chart both before the district court and before us showing corroborating trial evidence establishing the confession's reliability.

- Marler confessed: "Our sex lives became more intense, and I began to 'stretch the envelope.' . . . Pam was often very upset after doing these sexual things, because she was only doing them because she loved me. . . . I also did things that I regret, like bringing [H.M.] into our sexual fantasies." At trial, Pam testified that prior to the sexual abuse Marler would talk about doing so and he "always had his fantasies about other women" and would mention H.M.'s name, and "[w]hat he wanted to do. What he wanted us to do." H.M. also testified that she had previously mentioned Marler's odd sexual behavior to her mother and that whenever Pam confronted Marler about it they would fight, so H.M. "didn't say anything to [Pam] because [H.M.] always didn't want them to fight."

- Marler confessed: "Pam gave H.M. some sex toys and a sex video" and that he had purchased the toys in Wichita. Hawkins testified at trial that during H.M.'s sexual abuse evaluation interview H.M. reported "my dad gave me sex toys, a

29

vibrator, so I didn't feel like I had to go to a boy for sex." Pam told Hawkins she gave H.M. the toys at the direction of Marler. A social worker also testified that, in separate interviews, Pam indicated that she gave H.M. vibrators because Marler told her to, and H.M. indicated that she got a vibrator through Marler.

- Marler confessed: "I had talked to both of them about sex, but I had a very [explicit] and 'matter-of-fact' talk with [H.M.]" H.M. testified that Marler started to become "[r]eally perverted" and would ask her "really sexual things" and ask her to come sit on his lap. T.M. also testified that around New Years of 2007 Marler "had been acting really weird around my sister" and that Marler would ask her "really weird questions and stuff about, you know, inappropriate things that . . . he shouldn't be asking her about." T.M. also testified: "I remember H.M. told me a few times that she was scared of him and scared of, you know, something like that happening."

- Marler confessed: "Weeks before the event, I tested for a dosage of what would make [H.M.] drowsy." T.M. testified Marler first drugged his sister and him about a week before the sexual abuse occurred. T.M. stated, "I remember him saying that we both had like a fever, even though I felt fine, and he, like, gave us—he gave me, like, Nyquil. . . . [I]t put me out for . . . awhile," until the next morning.

- Marler confessed that H.M. was drugged on the trip to Wichita. Russell Beckwith, a friend of Marler's, testified that he met with Marler in the Wichita area between 12 a.m. and 1 a.m. on February 26, 2007, and that H.M. was with Marler and she appeared sleepy.

30

- Marler confessed that H.M. was drugged during the abuse and that he "did not want [H.M.] to wake up, so I then gave her more drugs." Pam confirmed that H.M. was drugged during the sexual abuse. H.M. testified: "My dad drugged me and—with Nyquil and pills and I was out for almost a week, I think." She also testified that Marler gave her "[t]wo and a half of those little medicine cups" of Nyquil followed by pills and that "[w]henever I woke up and heard my mom yelling, I remember him giving me some more."

- Marler confessed: "In the afternoon, after we had been fighting all day Pam left to get [T.M.]." Pam testified that she "went to school to pick up [T.M.] and I came home and found them" and that she got "angry" and that she and Marler got into an argument. T.M. recalled that his mom picked him up from school and that after she brought him home he heard his parents fighting.

- Regarding the sexual abuse itself, H.M. testified:

  "All I seen was my dad doing oral things, and I just seen that and kicked and turned around and said, 'No, Daddy, no.' And then I just blacked out again. . . . And I remember kind of waking up and seeing my mom yelling and telling him to stop, and—and I remember her leaving for a little while."

  H.M. also recalled waking a second time after seeing Marler in her crotch and she "kicked up to get [Marler] away, and—and then [she] was out again."

- Marler confessed that later in the day, around 8 or 9 p.m., "we tried again," Pam was upset, and Pam took H.M. to H.M.'s bed. Pam testified that H.M. did not leave her parents' bedroom until after dark when Pam "was allowed" to take H.M. to her room. H.M. recalled waking up in her bed with her mom with her.

31

- Marler confessed that in the days surrounding the sexual abuse "[H.M.] missed a couple of days of school." Pam testified that H.M. was out for about a week because Marler had drugged her. H.M. testified: "I don't know exactly how long [I was unconscious], but it had to of been at least three days that I was like sleeping constantly, because I thought it was a Monday when it was a Wednesday. My brother had told me when I woke up." T.M. remembered H.M. missing a few days of school during the week of the sexual abuse.

On appeal Marler complains there was no direct evidence to support his convictions of rape and aggravated indecent liberties with a child; however, a review of the record indicates that it is likely there is no direct proof because his victim was drugged and incoherent during his attacks. Further, the abuse was not reported until a few months after it occurred, reducing the likelihood of physical evidence. Here, the specific corroborated facts of the circumstantial evidence surrounding the crimes lend themselves toward a trustworthy confession.

Other factors supporting the trustworthiness of Marler's confession are Marler wrote the confession outside of the presence of law enforcement and then reviewed and confirmed the confession with law enforcement the next day; the availability of the facts or details contained in the confession from sources outside of Marler's personal knowledge; Marler's age, education, experience, and mental health; and the confession was made voluntarily and the conditions surrounding the confession were not coercive.

As to Marler's age, education, experience, and mental health, the prior panel of our court held:

"Marler's date of birth is December 19, 1962. At trial, Marler testified that he was an electrical engineer who designed and embedded microcontroller systems for Boeing vendors. Prior to that time, he was in the Army and worked for U.S. Missile Command

on missile guidance systems. Marler owned his own business for 20 years. During his competency evaluation, Marler told the evaluator that he had an IQ of 148. The evaluator described Marler as follows:

"'He is an intelligent man, with a good memory and is able to think in complicated ways and understand complicated concepts quite well. His memorization of Bible verses clearly depicts this ability. His verbal skills were excellent and his ability to think and reason were well [demonstrated]. His only issue in the exam was his propensity to fabricate stories which he from time to time would contradict or correct if questioned. This observation seemed related to a personality disorder, not a defect in mental ability.'" *Marler*, 2013 WL 5870049, at \*6.

Given the above, Marler's confession was trustworthy. Thus, the corpus delicti of Marler's crimes was satisfied. Because Marler's corpus delicti claim is meritless, he cannot show prejudice on the part of Shores, Pickering, or Spencer.

V. DID MARLER RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL WHEN SPENCER FAILED TO RAISE THAT SHORES FAILED TO TIMELY COMMUNICATE THE STATE'S PLEA OFFER?

Next Marler argues that he received ineffective assistance by Spencer when Spencer did not raise the issue that Shores was ineffective for failing to timely communicate the State's plea offer to him. The State responds that Marler cannot establish prejudice because the district court made a credibility determination and found that Marler would not have pled.

The requirements for establishing ineffective assistance of counsel have been discussed above, but we need not consider both prongs if Marler makes an insufficient showing on one prong of the ineffective assistance of counsel inquiry. See *Edgar v. State*, 294 Kan. 828, 843, 283 P.3d 152 (2012).

33

Marler's brief contains lengthy facts surrounding this issue. However, his argument essentially asks that we reweigh the evidence and assign credibility to witnesses different than what the district court did, which is not permitted. See *Llamas*, 298 Kan. at 254.

At Marler's first 60-1507 hearing Marler announced, "I didn't do this crime, okay." Marler boasted that he "could of took a plea deal" and he decided against it. He testified, "I wouldn't do that because I didn't do it." At both the trial and at the evidentiary hearing for his first 60-1507, he insisted on his innocence, that no crimes against H.M. ever occurred, and that he would never accept a plea. Yet at the evidentiary hearing on his second 60-1507 motion he stated otherwise. The district court explicitly found that "Marler's testimony at his second 1507 hearing [was] not credible" and that Marler would not have taken the plea. Because the district court did not find Marler credible, it held that Spencer's representation of Marler was not deficient when he did not raise this issue in Marler's first 60-1507 motion. Again, while the timeline surrounding the offer and communication of the plea is murky, this is immaterial because the district court, in assessing Marler's credibility and using his prior statements on the record, found that Marler would not have taken any plea offer.

Substantial competent evidence supports the district court's finding that Marler would not have accepted a plea deal. Therefore, Marler cannot show that he was prejudiced by Shores' actions, and Spencer was not ineffective.

VI.   DID MARLER RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL WHEN SPENCER FAILED TO RAISE THAT SHORES WAS INEFFECTIVE IN FAILING TO OBJECT TO EVIDENCE OF MARLER'S PRIOR BAD ACTS?

Marler argues that Spencer was ineffective when he failed to assert that Shores was ineffective for failing to object to evidence of Marler's prior bad acts—evidence that

34

he physically abused Pam, ran from law enforcement, and had legal pornography on his computer. Marler complains this evidence was inadmissible prior bad acts evidence under K.S.A. 60-455.

Under K.S.A. 2018 Supp. 60-455(a), "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion."

Assuming without deciding that the evidence was wrongfully admitted, any error was cured with a limiting jury instruction. The jury was instructed: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crimes charged. This evidence may be considered solely for the purpose of proving the nature of the relationships within the Marler family." Under *Strickland*, 466 U.S. at 695, "[t]he assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision." Moreover, we presume that juries follow their instructions. *State v. Kleypas*, 305 Kan. 224, 279, 382 P.3d 373 (2016), *cert. denied* 137 S. Ct. 1381 (2017).

Because the jury was instructed to limit its use of the evidence, any deficient performance would not have affected the outcome of the trial or the first 60-1507 proceeding. Marler cannot establish that he was prejudiced by Spencer's failure to raise this issue.

VII.   DID SPENCER FAIL TO THOROUGHLY INVESTIGATE THE CASE, INTERVIEW WITNESSES, AND ADEQUATELY PREPARE FOR MARLER'S FIRST 60-1507 HEARING?

Next, Marler argues that Spencer failed to thoroughly investigate the case, interview witnesses, and adequately prepare for Marler's first 60-1507 evidentiary

35

hearing, claiming three issues: (1) Spencer did not have Pam's tape-recorded interview, which he alleged in Issue III was suppressed by the State; (2) Spencer did not interview Marler's former sister-in-law; and (3) Spencer failed to call Shores' former legal assistant to testify regarding Shores' prior drug use.

First, Marler argues that Spencer should have used Pam's interview, but he also claims in Issue III of his appeal that this interview was suppressed by the State and unavailable for use. As discussed in that issue, Pam's interview was far more inculpatory than exculpatory, and there was no prejudice in any alleged failure by the State to disclose this evidence. Therefore, any failure to use such highly inculpatory evidence cannot be prejudicial. Additionally, if the evidence was truly suppressed by the State, Marler does not make a clear argument how Spencer's performance should be deemed deficient for not knowing of the interview.

Second, Marler argues that Spencer should have called Pam's sister, Shelley Lampkin, to testify. Lampkin testified at Marler's second 60-1507 hearing that Marler called her before his arrest and told her "he was going to tell a lie to the authorities to get them involved, to get the kids out of the house due to Pam's drug use." Lampkin testified Marler just mentioned telling a lie but she had no idea that Marler would confess to sexually abusing H.M. But Lampkin's vague testimony of an unspecified lie does not undermine the substantial corroboration of Marler's confession as discussed above. It does not explain why H.M. recalled she "kicked up to get [Marler] away" while she was drugged. Any failure to use this evidence was not deficient. Further, Marler does not clearly explain how using Lampkin's testimony would have changed the outcome of the 60-1507 proceeding, thus we see no prejudice.

Third, Marler faults Spencer for not calling Shores' former legal assistant to testify. However, this argument fails for the reasons set forth in Issue I. As the district court concluded: "From the testimony of [Marler's former legal assistant] above, it

36

appears likely that Shores['] drug use eventually led to a dramatically worse deterioration in Shores['] professional performance *after* the Marler trial."

Marler has failed to establish that Spencer was ineffective for failing to properly investigate the case, interview witnesses, or adequately prepare for the 60-1507 evidentiary hearing.

VIII.   WAS WELLS INEFFECTIVE FOR FAILING TO RAISE SPENCER'S INEFFECTIVENESS?

Marler argues that Wells was ineffective for failing to raise on appeal that Spencer was ineffective. Succinctly stated, none of Marler's claims have been found to be meritorious. Therefore, whatever Wells did or did not do in relation to the appeal of Marler's first 60-1507 motion makes no difference.

IX.   DID CUMULATIVE ERROR DEPRIVE MARLER OF EFFECTIVE REPRESENTATION IN HIS CASE AS A WHOLE?

Finally, Marler argues that the cumulative error of his various attorneys at different stages of the proceedings prejudiced him. However, because none of Marler's claims have merit, Marler cannot establish a violation of his right to effective representation of counsel by any of his attorneys. There is no cumulative error.

Affirmed.